# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

DREAM DEFENDERS, NEW FLORIDA MAJORITY EDUCATION FUND, ORGANIZE FLORIDA EDUCATION FUND, ZEBRA COALITION, ACACIA WILLIAMS, BIANCA MARIA BAEZ, MURRAY HELLER, PAULINA HERNANDEZ MORALES, CELCIO EDUARDO ROMERO, and SHEILA YOUNG,

     *Plaintiffs*,

     v.

RON DESANTIS, in his official capacity as Governor of the State of Florida, LAUREL M. LEE, in her official capacity as Florida Secretary of State, and FLORIDA ELECTIONS CANVASSING COMMISSION, KIM A. BARTON, in her official capacity as Supervisor of Elections for ALACHUA County, NITA CRAWFORD, in her official capacity as Supervisor of Elections for BAKER County, MARK ANDERSEN, in his official capacity as Supervisor of Elections for BAY County, TERRY L. VAUGHAN, in his official capacity as Supervisor of Elections for BRADFORD County, LORI SCOTT, in her official capacity as Supervisor of Elections for

Case No. 1:20-cv-67-RH-GRJ

Judge Robert L. Hinkle

1

BREVARD County, PETER
ANTONACCI, in his official capacity
as Supervisor of Elections for
BROWARD County, SHARON
CHASON, in her official capacity as
Supervisor of Elections for CALHOUN
County, PAUL A. STAMOULIS, in his
official capacity as Supervisor of
Elections for CHARLOTTE County,
SUSAN A. GILL, in her official
capacity as Supervisor of Elections for
CITRUS County, CHRIS H.
CHAMBLESS, in his official capacity
as Supervisor of Elections for CLAY
County, JENNIFER J. EDWARDS, in
her official capacity as Supervisor of
Elections for COLLIER County,
ELIZABETH P. HORNE, in her
official capacity as Supervisor of
Elections for COLUMBIA County,
MARK F. NEGLEY, in his official
capacity as Supervisor of Elections for
DESOTO County, STARLET
CANNON, in her official capacity as
Supervisor of Elections for DIXIE
County, MIKE HOGAN, in his official
capacity as Supervisor of Elections for
DUVAL County, DAVID H.
STAFFORD, in his official capacity as
Supervisor of Elections for
ESCAMBIA County, KAITI
LENHART, in her official capacity as
Supervisor of Elections for FLAGLER
County, HEATHER RILEY, in her

official capacity as Supervisor of
Elections for FRANKLIN County,
SHIRLEY G. KNIGHT, in her official
capacity as Supervisor of Elections for
GADSDEN County, CONNIE
SANCHEZ, in her official capacity as
Supervisor of Elections for
GILCHRIST County, ALETRIS
FARNAM, in her official capacity as
Supervisor of Elections for GLADES
County, JOHN HANLON, in his
official capacity as Supervisor of
Elections for GULF County, LAURA
HUTTO, in her official capacity as
Supervisor of Elections for
HAMILTON County, DIANE SMITH,
in her official capacity as Supervisor of
Elections for HARDEE County,
BRENDA HOOTS, in her official
capacity as Supervisor of Elections for
HENDRY County, SHIRLEY
ANDERSON, in her official capacity
as Supervisor of Elections for
HERNANDO County, PENNY OGG,
in her official capacity as Supervisor of
Elections for HIGHLANDS County,
CRAIG LATIMER, in his official
capacity as Supervisor of Elections for
HILLSBOROUGH County, THERISA
MEADOWS, in her official capacity as
Supervisor of Elections for HOLMES
County, LESLIE ROSSWAY SWAN,
in her official capacity as Supervisor of
Elections for INDIAN RIVER County,

3

SYLVIA D. STEPHENS, in her
official capacity as Supervisor of
Elections for JACKSON County,
MARTY BISHOP, in his official
capacity as Supervisor of Elections for
JEFFERSON County, TRAVIS HART,
in his official capacity as Supervisor of
Elections for LAFAYETTE County,
ALAN HAYS, in his official capacity
as Supervisor of Elections for LAKE
County, TOMMY DOYLE, in his
official capacity as Supervisor of
Elections for LEE County, MARK
EARLEY, in his official capacity as
Supervisor of Elections for LEON
County, TAMMY JONES, in her
official capacity as Supervisor of
Elections for LEVY County, GINA
MCDOWELL, in her official capacity
as Supervisor of Elections for
LIBERTY County, THOMAS
"TOMMY" R. HARDEE, in his
official capacity as Supervisor of
Elections for MADISON County,
MICHAEL BENNETT, in his official
capacity as Supervisor of Elections for
MANATEE County, WESLEY
WILCOX, in his official capacity as
Supervisor of Elections for MARION
County, VICKI DAVIS, in her official
capacity as Supervisor of Elections for
MARTIN County, CHRISTINA
WHITE, in her official capacity as

4

Supervisor of Elections for MIAMI-
DADCounty, JOYCE GRIFFIN, in
her official capacity as Supervisor of
Elections for MONROE County,
VICKI P. CANNON, in her official
capacity as Supervisor of Elections for
NASSAU County, PAUL A. LUX, in
his official capacity as Supervisor of
Elections for OKALOOSA County,
DIANE HAGAN, in her official
capacity as Supervisor of Elections for
OKEECHOBEE County, BILL
COWLES, in his official capacity as
Supervisor of Elections for ORANGE
County, MARY JANE ARRINGTON,
in her official capacity as Supervisor of
Elections for OSCEOLA County,
WENDY SARTORY LINK, in her
official capacity as Supervisor of
Elections for PALM BEACH County,
BRIAN E. CORLEY, in his official
capacity as Supervisor of Elections for
PASCO County, DEBORAH CLARK,
in her official capacity as Supervisor of
Elections for PINELLAS County,
LORI EDWARDS, in her official
capacity as Supervisor of Elections for
POLK County, CHARLES
OVERTURF, in his official capacity as
Supervisor of Elections for PUTNAM
County, TAPPIE A. VILLANE, in her
official capacity as Supervisor of
Elections for SANTA ROSA County,
RON TURNER, in his official capacity

5

as Supervisor of Elections for
SARASOTA County, CHRIS
ANDERSON, in his official capacity as
Supervisor of Elections for
SEMINOLE County, VICKY OAKES,
in her official capacity as Supervisor of
Elections for ST. JOHNS County,
GERTRUDE WALKER, in her official
capacity as Supervisor of Elections for
ST. LUCIE County, WILLIAM KEEN,
in his official capacity as Supervisor of
Elections for SUMTER County,
GLENDA B. WILLIAMS, in her
official capacity as Supervisor of
Elections for SUWANNEE County,
DANA SOUTHERLAND, in her
official capacity as Supervisor of
Elections for TAYLOR County,
DEBORAH K. OSBORNE, in her
official capacity as Supervisor of
Elections for UNION County, LISA
LEWIS, in her official capacity as
Supervisor of Elections for VOLUSIA
County, HENRY WELLS, in his
official capacity as Supervisor of
Elections for WAKULLA County,
BOBBY BEASLEY, in his official
capacity as Supervisor of Elections for
WALTON County, CAROL F. RUDD,
in her official capacity as Supervisor of
Elections for WASHINGTON County,
CANVASSING BOARD OF ALACHUA
COUNTY, CANVASSING BOARD OF
BAKER COUNTY, CANVASSING

6

BOARD of  BAY COUNTY,
CANVASSING BOARD of BRADFORD
COUNTY, CANVASSING BOARD of
BREVARD COUNTY, CANVASSING
BOARD of BROWARD COUNTY,
CANVASSING BOARD of CALHOUN
COUNTY, CANVASSING BOARD of
CHARLOTTE COUNTY,
CANVASSING BOARD of CITRUS
COUNTY, CANVASSING BOARD of
CLAY COUNTY, CANVASSING
BOARD of COLLIER COUNTY,
CANVASSING BOARD of COLUMBIA
COUNTY, CANVASSING BOARD of
DESOTO COUNTY, CANVASSING
BOARD of DIXIE COUNTY,
CANVASSING BOARD of DUVAL
COUNTY, CANVASSING BOARD of
ESCAMBIA COUNTY, CANVASSING
BOARD of FLAGLER COUNTY,
CANVASSING BOARD of FRANKLIN
COUNTY, CANVASSING BOARD of
GADSDEN COUNTY, CANVASSING
BOARD of GILCHRIST COUNTY,
CANVASSING BOARD of GLADES
COUNTY, CANVASSING BOARD of
GULF COUNTY, CANVASSING
BOARD of HAMILTON COUNTY,
CANVASSING BOARD of HARDEE
COUNTY, CANVASSING BOARD of
HENDRY COUNTY, CANVASSING
BOARD of HERNANDO COUNTY,
CANVASSING BOARD of
HIGHLANDS COUNTY,
CANVASSING BOARD of
HILLSBOROUGH COUNTY,
CANVASSING BOARD of HOLMES
COUNTY, CANVASSING BOARD of
INDIAN RIVER COUNTY,
CANVASSING BOARD OF JACKSON

7

COUNTY, CANVASSING BOARD of
JEFFERSON COUNTY, CANVASSING
BOARD of LAFAYETTE COUNTY,
CANVASSING BOARD of LAKE
COUNTY, CANVASSING BOARD of
LEE COUNTY, CANVASSING BOARD
of LEON COUNTY, CANVASSING
BOARD of LEVY COUNTY,
CANVASSING BOARD of LIBERTY
COUNTY, CANVASSING BOARD of
MADISON COUNTY, CANVASSING
BOARD of MANATEE COUNTY,
CANVASSING BOARD of MARION
COUNTY, CANVASSING BOARD of
MARTIN COUNTY, CANVASSING
BOARD of MIAMI-DADE COUNTY,
CANVASSING BOARD of MONROE
COUNTY, CANVASSING BOARD of
NASSAU COUNTY, CANVASSING
BOARD of OKALOOSA COUNTY,
CANVASSING BOARD of
OKEECHOBEE COUNTY,
CANVASSING BOARD of ORANGE
COUNTY, CANVASSING BOARD of
OSCEOLA COUNTY, CANVASSING
BOARD of PALM BEACH COUNTY,
CANVASSING BOARD of PASCO
COUNTY,  CANVASSING BOARD of
PINELLAS COUNTY, CANVASSING
BOARD of POLK COUNTY,
CANVASSING BOARD of PUTNAM
COUNTY, CANVASSING BOARD of
SANTA ROSA COUNTY,
CANVASSING BOARD of SARASOTA
COUNTY,  CANVASSING BOARD of
SEMINOLE COUNTY, CANVASSING
BOARD of ST. JOHNS COUNTY,
CANVASSING BOARD of ST. LUCIE
COUNTY, CANVASSING BOARD of
SUMTER COUNTY, CANVASSING

8

BOARD of SUWANNEE COUNTY,
CANVASSING BOARD of TAYLOR
COUNTY, CANVASSING BOARD of
UNION COUNTY, CANVASSING
BOARD of VOLUSIA COUNTY,
CANVASSING BOARD of WAKULLA
COUNTY, CANVASSING BOARD of
WALTON COUNTY, CANVASSING
BOARD of WASHINGTON COUNTY,

  *Defendants*.

## SECOND AMENDED COMPLAINT

1. The COVID-19 pandemic has upended every aspect of American life, and in Florida, the pandemic threatens the very basis of our democratic system—free, fair, and accessible elections, because Defendants Governor Ron DeSantis, Secretary of State Laurel Lee, the Florida Elections Canvassing Commission, and Florida's County Supervisors of Elections have failed to take steps to protect every Floridian's right to vote. Public health officials project that the pandemic will continue to impact our lives in the coming days, weeks, and months, restricting our movements and ability to engage in "normal" activity.  The COVID-19 crisis should not block voters from casting ballots or force them to make choices between their health and participating in the democratic process.

2. In the presidential preference primary (PPP) on March 17, 2020, many Florida voters were denied any opportunity to cast a ballot as a result of Florida's

failure and refusal to take any action to ensure the right to vote, bringing turnout to a historic low.

3.     There are two more elections scheduled for 2020, neither of which will be open, fair, secure, and accessible if Florida's voting system is not adjusted to meet the needs of this unprecedented emergency. Immediate action by the Governor, the Secretary of State, and the Elections Canvassing Commission remove barriers to registering and voting is necessary to ensure all eligible Floridians can exercise their right to vote safely and without risk to the health and welfare of themselves, their families, or their communities.

4.     In light of social distancing requirements and the health risks resulting from the COVID-19 pandemic, overly restrictive vote by mail processes, failure to make accommodations for disabled voters, ballot submission deadlines, an anemic online voter registration system, failure to provide vote by mail ballots and materials in Spanish, unrealistic ballot curing timeframes, and a paucity of ballot delivery mechanisms threaten the right to vote of countless Floridians. Defendants' failure to make any meaningful accommodation to mitigate these impacts of the COVID-19 crisis poses an undue burden on the right to vote in violation of the Constitution, the Voting Rights Act, the Americans with Disabilities Act, and the Rehabilitation Act. Without immediate action, marginalized and underserved voters will face severe and uneven burdens casting a ballot by mail, if they are able to do so at all, and voters

with disabilities and health conditions putting them at heightened risk from COVID-19 will be denied the resources they depend upon to cast a secret ballot on their own. To ensure that the right to vote is not compromised due to present public health crisis, Defendants must act now to prepare for upcoming elections and address the needs of vulnerable voters in this time of crisis.

5.     Having already once observed the impact of the state's refusal to accommodate the enormous dangers COVID-19 has created for its residents on Election Day, and because many Floridians, including Plaintiffs, their members, and their communities, will be denied the right to vote or unable to access a ballot in the upcoming elections, Plaintiffs bring this action to protect the fundamental right to vote and to vindicate their rights under the Voting Rights Act, the Americans with Disabilities Act, and the Rehabilitation Act.

## JURISDICTION & VENUE

6.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution,  § 2 and § 203 of the Voting Rights Act ("VRA"), 52 U.S.C.A. §§ 10301, 10503, the Fourteenth and Fifteenth Amendments of the United States Constitution, and under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

7.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States. Plaintiffs bring this action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution of the United States and federal law. Plaintiffs bring this action to secure equitable relief under federal law providing for the protection of voting rights, pursuant to 28 U.S.C. § 2202.

8.     This Court has personal jurisdiction over Defendants, who are sued only in their official capacity as officers of the State of Florida or its political subdivisions.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b). Plaintiff Williams resides in Gainesville, Plaintiff Dream Defenders has members in Gainesville, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

10.    This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

**A.   Plaintiffs**

11.   Plaintiff DREAM DEFENDERS is a Florida non-profit organization with its principal office in Miami-Dade County, Florida.[1] The organization was established in 2012 following the killing of teenager Trayvon Martin and is led by Black and Brown youth. Dream Defenders uses training and organizing of youth and students to confront structural inequality. The organization conducts civic engagement activities across the state of Florida, including voter registration and get out the vote efforts. The membership of Dream Defenders includes college students throughout the state of Florida who have been displaced from their schools due to the coronavirus pandemic, some of whom were unable to vote in the PPP due to the state's failure to expand voting opportunities. Defendants' failure to offer appropriate and necessary accommodations in response to the pandemic is thwarting these members' ability to cast ballots and have them count in the 2020 election cycle, and hindering the organization's efforts to register Floridians to vote and help them vote, and causing the organization to divert resources including staff time away from other critical organizational activities, to secure the participation of registered Floridians in upcoming elections.

---

[1] Dream Defenders is a fiscally sponsored project of Tides Advocacy, a California-based non-profit.

12.   Plaintiff NEW FLORIDA MAJORITY EDUCATION FUND ("NewFM") is a Florida non-profit corporation and membership organization with its principal office in Miami-Dade County, Florida. Founded in 2009, NewFM is dedicated to organizing, educating, and mobilizing disempowered communities in Florida to win equity and fairness throughout the State. NewFM's central focus is to expand democracy by ensuring that every person eligible to vote, regardless of party affiliation, can exercise his or her fundamental and constitutionally protected right to vote. To achieve its goal, NewFM works with individual members and organizations across the state of Florida engaged in civic and democratic endeavors to assist underserved communities in voter registration, voter education and get out the vote efforts. Defendants' failure to take necessary steps to address the state of emergency caused by coronavirus thwarts the organization's efforts to increase voter participation, harms its members who are registered voters in the state of Florida— some of whom were unable to vote in the PPP—and who plan to vote in the upcoming August 18, 2020 Primary Election or November 3, 2020 General Election, and is causing the organization to divert resources including staff time to secure the participation of Floridians in upcoming elections, away from voter registration, voter education and get out the vote efforts.

13.   Plaintiff ORGANIZE FLORIDA EDUCATION FUND is a community-based, non-profit member organization with its principal offices in

Orange County, Florida. Its membership consists of low- and moderate-income people dedicated to the principles of social, racial, and economic justice and the promotion of an equal and fair Florida for all. Organize Florida's members throughout the state of Florida bring communities together to join in the fight for safe neighborhoods, healthy families, quality education, good jobs, justice, equality, and a more representative democracy. Organize Florida's major campaigns have included supporting children and families and increasing Latinx voter turnout. The organization is committed to exposing injustice and holding Florida's leaders accountable. The state's failure to take necessary steps to accommodate impacted voters in light of the coronavirus outbreak hinders the organization's efforts to increase participation among the communities it serves, harms its members who are registered voters—some of whom were unable to vote in the PPP—and who plan to vote in the upcoming August 18, 2020 Primary Election or November 3, 2020 General Election, and is causing the organization to divert resources including staff time to secure the participation of Floridians in upcoming elections, away from voter registration, voter education and get out the vote efforts.

14.     Plaintiff ZEBRA COALITION is a community-based, nonprofit organization based in Orlando, Florida. Its mission is to support and inspire LGBTQ+ youth by assisting young people facing homelessness, bullying, isolation from their families, and physical, sexual and drug abuse with individualized programs to guide

them to recovery and stability. The Zebra Coalition provides temporary housing to young adults facing homelessness as well as access to a network of organizations who provide essential services to LGBTQ+ youth such as mental health counseling, assistance with obtaining identification documents and other legal document and services, leadership training and support services. The Zebra Coalition seeks to mobilize and engage the young people it serves though voter registration. The state's failure to take steps during the public health crisis necessary to prevent the disenfranchisement of homeless and housing-insecure individuals and youth with temporary living accommodations hinders the organization's ability to engage the individuals it serves in the political process, causing the organization to divert resources including staff time to ensure they can participate in upcoming elections. Zebra Coalition's youth residents with health risks also are fearful of physical contacts at government and other offices.

15.     Plaintiff ACACIA WILLIAMS is a full-time student in her second year at the University of Florida in Gainesville, Florida. Her family resides in Sullivan County, New York. On or around March 13, 2020, Ms. Williams complied with a directive from the University of Florida to leave her dorm and not to return to campus, due to the coronavirus outbreak. Subsequently, the University announced that it will maintain remote classes through its summer sessions, with students remaining away from campus. Ms. Williams is currently at her parents' home in Sullivan County,

New York, and does not know when she will be permitted to return to the University of Florida campus.

16.     Plaintiff, BIANCA MARIA BAEZ is a registered voter in Leon County, Florida who was unable to vote during the Presidential Preference Primary because she was self-isolating after returning home from an international trip.  Ms. Baez's preference is to vote in-person on election day. However, because of her concerns of exposure to COVID-19, she plans to vote by mail in the upcoming elections. Ms. Baez prefers to submit her ballot via curbside delivery as she is distrustful of her ballot being delivered by the U.S. Postal Service in time to be counted.

17.     Plaintiff MURRAY HELLER is an 86-year-old registered voter in Delray Beach, Florida. Before the COVID-19 pandemic, he planned to vote in person at his polling location in Florida's March 17, 2020, Presidential Preference Primary. Because of Governor DeSantis's executive order banning gatherings and because of Mr. Heller's age, his pacemaker, and his history of cardiac conditions and the grave health consequences for older voters with his health conditions like his of contracting COVID-19, Mr. Heller could not vote at his assigned polling place. As a result of Defendants' failure to extend the vote by mail request deadline or make other accommodations to allow vulnerable individuals like himself to vote safely, Mr. Heller was totally denied an opportunity to cast a ballot in the PPP. As the pandemic has spread, Mr. Heller's fear of the serious health risks he faces from COVID-19 has

only increased. Plaintiff Heller wants to vote in the upcoming August and November 2020 elections, but he fears he will again be unable to vote in person. Plaintiff Heller would vote by mail using a ballot drop box if he could navigate the vote-by-mail process without the need to expose himself to health risks, or in person using curbside voting if it were made available to him.

18.    Plaintiff PAULINA HERNANDEZ MORALES is an 85-year-old naturalized U.S. Citizen and voter in Seminole County, Florida.  Ms. Hernandez Morales lives with stage 2 breast cancer and has high blood pressure. Ms. Hernandez Morales has attempted to vote by mail in Florida in the past. Twice, most recently in 2018, after she sent her ballot to the SOE, it was not received in time to be counted. Ms. Hernandez Morales has read that vote-by-mail ballots have frequently been rejected in her community by Defendant Chris Anderson, Supervisor of Elections for Seminole County and his predecessors. Because she does not trust the vote-by-mail system due to her past experiences with attempting to vote-by-mail in the state, Ms. Hernandez Morales had planned to vote in person on election day in the upcoming elections. She wants the reassurance of seeing her ballot counted, and she requires the assistance of a Spanish-language poll-worker or other person to make an informed decision on Election Day. Ms. Hernandez-Morales is not able to vote in-person this year because her health conditions and age place her in the high-risk category for COVID-19. In the past, Ms. Hernandez has received Spanish-language assistance

from friends, but with the COVID-19 pandemic, her friends are not able to assist her. Ms. Hernandez is worried her ballot will again not be counted. Ms. Hernandez Morales would be able to vote if she could access assistance, for example from election officials, and had a way to be sure her vote-by-mail ballot would be counted, such as an ability to track her mail ballot reliably and a meaningful opportunity to cure any problems with her ballot. She would also be able to vote if Florida offered curbside voting, which would allow her to access assistance to vote on election day and ensure her vote is counted.

19.    Plaintiff CELCIO EDUARDO ROMERO is a 76-year-old naturalized U.S. citizen, and a resident of and voter in Orange County, Florida. Plaintiff Romero's dominant language is Spanish. Plaintiff Romero lives with multiple sclerosis (MS), and suffered a stroke a few years ago. As a result, he has limited mobility and has lost the ability to write. He can sign his initials with great difficulty, but he can no longer sign his full name. He also lives with diabetes and high blood pressure, heightening his vulnerability to COVID-19. Mr. Romero lives in a senior residence, Magnolia Towers, that is connected to an assisted living facility and is near his medical providers. Mr. Romero typically votes in person at his polling place but cannot safely leave his residence and go inside a polling station during the COVID-19 pandemic. Defendant Bill Cowles, Supervisor of Elections for Orange County, and Defendant's predecessors has never conducted supervised voting at Magnolia

Towers or placed a polling place there. Plaintiff Romero would like to vote by mail this year but cannot do so without assistance marking his vote-by-mail ballot or technology that would allow him to do so independently. He is also concerned that, because he cannot sign his name, his ballot is likely to be rejected.

20.     Plaintiff SHEILA YOUNG is a resident of Orange County, Florida. She is eligible and registered to vote. Plaintiff Young is blind. To vote, she uses assistive technology available at her polling place that allows her to mark her ballot independently and privately. Though she had concerns about appearing in person at her polling place in the PPP, she did so because it was the only way she could cast her ballot independently. As COVID-19 outbreak has spread, Ms. Young has become even more concerned about voting at her polling place in the August and November 2020 elections and cannot do so without grave risk to her health. As a blind person, she cannot see whether she is standing the necessary six feet away from others. She cannot navigate a polling-place line in which voters must remain six feet apart or see whether poll workers are properly disinfecting the accessible equipment between voters.

21.     Ms. Young would like to vote by mail but because she is blind, she cannot mark a paper vote-by-mail ballot without assistance from another person. It is important to her to be able to vote independently and privately. She does not want to be forced to request someone else mark her paper vote-by-mail ballot because that

would violate the secrecy of her ballot and her autonomy. She would use an electronic ballot delivery option to mark her ballot at home if Florida officials, including but not limited to Defendant Bill Cowles, Supervisor of Elections for Orange County, and Defendant Laurel M. Lee, Florida Secretary of State, provided blind voters like herself with that option. The need for postage to request and return her mail ballot also poses an obstacle to Ms. Young. The U.S. Postal Service's website does not offer an accessible means of purchasing postage online, and social distancing concerns prevent her from purchasing postage at the Post Office or other locations. Without an accessible option to mark her mail ballot and with the other obstacles she faces voting by mail, Plaintiff Young will not be able to cast an independent and private ballot in the August and November 2020 elections.

22.   Defendants' refusal to make appropriate changes in voter registration and election procedures to address the COVID-19 public health emergency will frustrate organizational Plaintiffs' respective missions and cause them to divert resources by interfering with their members' efforts to safely and effectively cast a ballot in the upcoming August primary and November General Election. Individual Plaintiffs will be unable to vote safely at their assigned polling places, and unless vote-by-mail procedures are adjusted to address the current reality, they will be unable to vote by mail as well.

21

**B.** **Defendants**

23.     Defendant RON DESANTIS is sued in his official capacity as Governor of the State of Florida. Defendant DeSantis is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. As Governor of Florida, Defendant DeSantis is the state's chief executive officer and is responsible for the administration of all state laws, including those pertaining to elections. Defendant DeSantis is also a member of the Elections Canvassing Commission as established in Florida Statute § 102.111. As Governor of the State of Florida, Defendant DeSantis is vested with emergency powers related to the suspension or delay of elections resulting from a state emergency. Fla. Stat. § 101.733.

24.     Defendant LAUREL M. LEE is sued in her official capacity as Florida Secretary of State. Defendant Lee is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. Pursuant to Florida Statute § 97.012, the Secretary of State is the chief elections officer of the State and is responsible for the administration of state laws affecting voting. Defendant has the authority to oversee the administration of elections by Florida's 67 county supervisors of elections.

25.     Defendant ELECTIONS CANVASSING COMMISSION (together with Defendants DeSantis and Lee, "State Defendants") is sued as a state-created entity. Its membership consists of the Governor and two members of the Cabinet selected by the Governor, as set forth in Florida Statute § 102.111. Pursuant to Florida

Statute § 101.698, the Elections Canvassing Commission is tasked with adopting emergency rules to facilitate absentee voting during emergency situations.

26.    Defendants KIM A. BARTON, Supervisor of Elections for ALACHUA County, NITA CRAWFORD, Supervisor of Elections for BAKER County, MARK ANDERSEN, Supervisor of Elections for BAY County, TERRY L. VAUGHAN, Supervisor of Elections for BRADFORD County, LORI SCOTT, Supervisor of Elections for BREVARD County, PETER ANTONACCI, Supervisor of Elections for BROWARD County, SHARON CHASON, Supervisor of Elections for CALHOUN County, PAUL A. STAMOULIS, Supervisor of Elections for CHARLOTTE County, SUSAN A. GILL, Supervisor of Elections for CITRUS County, CHRIS H. CHAMBLESS, Supervisor of Elections for CLAY County, JENNIFER J. EDWARDS, Supervisor of Elections for COLLIER County, ELIZABETH P. HORNE, Supervisor of Elections for COLUMBIA County, MARK F. NEGLEY, Supervisor of Elections for DESOTO County, STARLET CANNON, Supervisor of Elections for DIXIE County, MIKE HOGAN, Supervisor of Elections for DUVAL County, DAVID H. STAFFORD, Supervisor of Elections for ESCAMBIA County, KAITI LENHART, Supervisor of Elections for FLAGLER County, HEATHER RILEY, Supervisor of Elections for FRANKLIN County, SHIRLEY G. KNIGHT, Supervisor of Elections for GADSDEN County, CONNIE SANCHEZ, Supervisor of Elections for GILCHRIST County, ALETRIS FARNAM,

23

Supervisor of Elections for GLADES County, JOHN HANLON, Supervisor of Elections for GULF County, LAURA HUTTO, Supervisor of Elections for HAMILTON County, DIANE SMITH, Supervisor of Elections for HARDEE County, BRENDA HOOTS, Supervisor of Elections for HENDRY County, SHIRLEY ANDERSON, Supervisor of Elections for HERNANDO County, PENNY OGG, Supervisor of Elections for HIGHLANDS County, CRAIG LATIMER, Supervisor of Elections for HILLSBOROUGH County, THERISA MEADOWS, Supervisor of Elections for HOLMES County, LESLIE ROSSWAY SWAN, Supervisor of Elections for INDIAN RIVER County, SYLVIA D. STEPHENS, Supervisor of Elections for JACKSON County, MARTY BISHOP, Supervisor of Elections for JEFFERSON County, TRAVIS HART, Supervisor of Elections for LAFAYETTE County, ALAN HAYS, Supervisor of Elections for LAKE County, TOMMY DOYLE, Supervisor of Elections for LEE County, MARK EARLEY, Supervisor of Elections for LEON County, TAMMY JONES, Supervisor of Elections for LEVY County, GINA MCDOWELL, Supervisor of Elections for LIBERTY County, THOMAS "TOMMY" R. HARDEE, Supervisor of Elections for MADISON County, MICHAEL BENNETT, Supervisor of Elections for MANATEE County, WESLEY WILCOX, Supervisor of Elections for MARION County, VICKI DAVIS, Supervisor of Elections for MARTIN County, CHRISTINA WHITE, Supervisor of Elections for MIAMI-DADE County, JOYCE GRIFFIN, Supervisor

24

of Elections for MONROE County, VICKI P. CANNON, Supervisor of Elections for NASSAU County, PAUL A. LUX, Supervisor of Elections for OKALOOSA County, DIANE HAGAN, Supervisor of Elections for OKEECHOBEE County, BILL COWLES, Supervisor of Elections for ORANGE County, MARY JANE ARRINGTON, Supervisor of Elections for OSCEOLA County, WENDY SARTORY LINK, Supervisor of Elections for PALM BEACH County, BRIAN E. CORLEY, Supervisor of Elections for PASCO County, DEBORAH CLARK, Supervisor of Elections for PINELLAS County, LORI EDWARDS, Supervisor of Elections for POLK County, CHARLES OVERTURF, Supervisor of Elections for PUTNAM County, TAPPIE A. VILLANE, Supervisor of Elections for SANTA ROSA County, RON TURNER, Supervisor of Elections for SARASOTA County, CHRIS ANDERSON, Supervisor of Elections for SEMINOLE County, VICKY OAKES, Supervisor of Elections for ST. JOHNS County, GERTRUDE WALKER, Supervisor of Elections for ST. LUCIE County, WILLIAM KEEN, Supervisor of Elections for SUMTER County, GLENDA B. WILLIAMS, Supervisor of Elections for SUWANNEE County, DANA SOUTHERLAND, Supervisor of Elections for TAYLOR County, DEBORAH K. OSBORNE, Supervisor of Elections for UNION County, LISA LEWIS, Supervisor of Elections for VOLUSIA County, HENRY WELLS, Supervisor of Elections for WAKULLA County, BOBBY BEASLEY, Supervisor of Elections for WALTON County, CAROL F. RUDD, Supervisor of

Elections for WASHINGTON County, are all sued in their official capacities as County Election Supervisors for their respective counties (collectively, "Supervisors" or "SOEs"). The Supervisors are persons within the meaning of 42 U.S.C. § 1983 and act under color of state law. The Supervisors are responsible for the administration of Florida laws and regulations related to voter registration, vote by mail, and the conduct of elections, including but not limited to: notifying registrants of incomplete voter registrations, Fla. Stat. § 97.073; requesting ballots that comply with a voter's language preference, Fla. Stat. § 101.2515; establishing the number and locations of secure ballot drop boxes, Fla. Stat. § 101.69(2); providing VBM ballots to non-family members to deliver to voters, Fla. Stat. § 101.62(4)(c)(4); implementing the procedures for verifying signatures of and curing defects in vote by mail ballots, Fla. Stat. §§ 101.68(1) & 101.68(4); determining the hours and locations of early voting sites, Fla. Stat. § 101.657(d); ensuring the accessibility of polling places in compliance with the Florida Americans with Disabilities Accessibility Implementation Act, Fla. Stat. § 101.71(2); providing for supervised voting for voters residing in assisted living facilities or nursing homes, Fla. Stat. §101.655(1); and implementing emergency contingency plans for a suspended or delayed election. Fla. Admin Code r. 1S-9.005.

27.   Defendants CANVASSING BOARD of ALACHUA COUNTY, CANVASSING BOARD of BAKER COUNTY, CANVASSING BOARD of BAY

26

COUNTY, CANVASSING BOARD of BRADFORD COUNTY, CANVASSING BOARD of BREVARD COUNTY, CANVASSING BOARD of BROWARD COUNTY, CANVASSING BOARD of CALHOUN COUNTY, CANVASSING BOARD of CHARLOTTE COUNTY, CANVASSING BOARD of CITRUS COUNTY, CANVASSING BOARD of CLAY COUNTY, CANVASSING BOARD of COLLIER COUNTY, CANVASSING BOARD of COLUMBIA COUNTY, CANVASSING BOARD of DESOTO COUNTY, CANVASSING BOARD of DIXIE COUNTY, CANVASSING BOARD of DUVAL COUNTY, CANVASSING BOARD of ESCAMBIA COUNTY, CANVASSING BOARD of FLAGLER COUNTY, CANVASSING BOARD of FRANKLIN COUNTY, CANVASSING BOARD of GADSDEN COUNTY, CANVASSING BOARD of GILCHRIST COUNTY, CANVASSING BOARD of GLADES COUNTY, CANVASSING BOARD of GULF COUNTY, CANVASSING BOARD of HAMILTON COUNTY, CANVASSING BOARD of HARDEE COUNTY, CANVASSING BOARD of HENDRY COUNTY, CANVASSING BOARD of HERNANDO COUNTY, CANVASSING BOARD of HIGHLANDS COUNTY, CANVASSING BOARD of HILLSBOROUGH COUNTY, CANVASSING BOARD of HOLMES COUNTY, CANVASSING BOARD of INDIAN RIVER COUNTY, CANVASSING BOARD of JACKSON COUNTY, CANVASSING BOARD of JEFFERSON COUNTY, CANVASSING BOARD of LAFAYETTE COUNTY, CANVASSING BOARD of

27

LAKE COUNTY, CANVASSING BOARD of LEE COUNTY, CANVASSING BOARD of LEON COUNTY, CANVASSING BOARD of LEVY COUNTY, CANVASSING BOARD of LIBERTY COUNTY, CANVASSING BOARD of MADISON COUNTY, CANVASSING BOARD of MANATEE COUNTY, CANVASSING BOARD of MARION COUNTY, CANVASSING BOARD of MARTIN COUNTY, CANVASSING BOARD of MIAMI-DADE COUNTY, CANVASSING BOARD of MONROE COUNTY, CANVASSING BOARD of NASSAU COUNTY, CANVASSING BOARD of OKALOOSA COUNTY, CANVASSING BOARD of OKEECHOBEE COUNTY, CANVASSING BOARD of ORANGE COUNTY, CANVASSING BOARD of OSCEOLA COUNTY, CANVASSING BOARD of PALM BEACH COUNTY, CANVASSING BOARD of PASCO COUNTY,  CANVASSING BOARD of PINELLAS COUNTY, CANVASSING BOARD of POLK COUNTY, CANVASSING BOARD of PUTNAM COUNTY, CANVASSING BOARD of SANTA ROSA COUNTY, CANVASSING BOARD of SARASOTA COUNTY, CANVASSING BOARD of SEMINOLE COUNTY, CANVASSING BOARD of ST. JOHNS COUNTY, CANVASSING BOARD of ST. LUCIE COUNTY, CANVASSING BOARD of SUMTER COUNTY, CANVASSING BOARD of SUWANNEE COUNTY, CANVASSING BOARD of TAYLOR COUNTY, CANVASSING BOARD of UNION COUNTY, CANVASSING BOARD of VOLUSIA COUNTY,

CANVASSING BOARD of WAKULLA COUNTY, CANVASSING BOARD of WALTON COUNTY, CANVASSING BOARD of WASHINGTON COUNTY are sued as entities created pursuant to Fla. Stat. § 102.141 for each county in Florida, whose membership consists of the county SOE, a county court judge and the chair of the board of the county commissioners (collectively, "County Canvassing Boards," and, together with the Supervisors, the "County Defendants"). The County Canvassing Boards are responsible for canvassing VBM ballots, verifying the signatures of VBM ballots, verifying the validity of signatures on cure affidavits, and resolving challenges to the legality of VBM ballots. Fla. Stat. § 101.68.

## STATEMENT OF FACTS

**A.      The COVID-19 Pandemic**

28.     On December 1, 2019, the first confirmed COVID-19 patient began experiencing symptoms in China's Hubei province.[2] The novel coronavirus infection rapidly spread to other countries. By January 21, 2020, the Centers for Disease Control and Prevention ("CDC") confirmed the first patient in the United States.[3] On

---

[2] Fernando Duarte, "Who Is 'Patient Zero' in the Coronavirus Outbreak," BBC (Feb. 23, 2020) (online at www.bbc.com/future/article/20200221-coronavirus-the-harmful-hunt-for-covid-19s-patient-zero).

[3] Elizabeth Cohen, "First US Case of Wuhan Coronavirus Confirmed by CDC," CNN (Jan. 21, 2020) (online at www.cnn.com/2020/01/21/health/wuhan-coronavirus-first-us-case-cdc-bn/index.html).

March 11, 2020, the World Health Organization announced that COVID-19, the disease that is causing the 2019 novel coronavirus outbreak had become a pandemic.

29.   Scientists and public health officials do not yet fully understand COVID-19, who will become mildly ill, who will get severely ill, and who will die.[4] People who have tested positive from the virus experience symptoms ranging from very mild (including potentially a majority of people who experience no symptoms) to severe. A significant percentage of those who contract COVID-19 die as a result of the disease.[5] An early report from China suggested that in 16% of cases, people with COVID-19 become seriously ill.[6]

30.   COVID-19 creates a significantly higher risk of serious illness or death for individuals, such as Plaintiffs Romero, Hernandez Morales, and Heller, who have underlying chronic health conditions, including heart disease, diabetes, and cancer and persons with compromised immune systems including some of the individuals served by the Zebra Coalition. One study found that, among patients diagnosed with COVID-19, individuals who had one chronic condition were 1.8 times more likely than those without a chronic condition to have a "poor outcome," such as requiring a ventilator or dying. That rate jumped to 2.6 times greater risk for individuals with two chronic conditions. The Centers for Disease Control agrees that "people of any

---

[4] Ctrs. for Disease Control & Prevention, supra note 1.
[5] Ctrs. for Disease Control & Prevention, supra note 1.
[6] *Id.*

age with underlying health conditions, such as diabetes, lung disease, or heart disease, are at greater risk of severe illness from COVID-19."[7]

31.    Moreover, people of color are experiencing a higher rate of death due to COVID-19.  In New York City, African Americans and Latinx are dying at twice the rates of whites. In Chicago, 70% of persons who died from the virus were African American, which is more than twice their percentage in the city's population. According to the United States Census 2019 population estimates, African Americans and Latinx represent 43% of Florida's population. Many of these communities are located in densely populated areas, where the virus tends to spread very quickly.

32.    The disease also creates a greater risk of serious health consequences and death on older adults. This is especially true for people 65 years and older, such as Plaintiffs Romero, Hernandez Morales, and Heller, and people who live in a nursing home or long-term care facility. An early report by the CDC found that 80% of deaths in the United States were among adults 65 years and older. Well over a quarter of Florida's voting age population is over the age of 65.

33.    As of April 17, 2020, more than 600,000 Americans have contracted COVID-19. Of that number, more than 40,000 people have died. The death toll in the

---

[7] Centers for Disease Control, "Know the facts about coronavirus disease 2019 (COVID-19) and help stop the spread of rumors" (March 12, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/share-facts.html.

U.S. has increased to around 2,000 a day. Florida currently has nearly 26,000 confirmed cases of patients with COVID-19. Over 750 of those people have died. These numbers likely understate the extent of the outbreak: Because of a lack of available testing, most people do not get a coronavirus test unless they experience severe symptoms, meaning many people with mild or no symptoms may have had COVID-19 without ever being tested. The rate of infection is continuing to rise in Florida and will likely be exacerbated by the reality that thousands of people fled the New York City region to Florida following that state's issuance of a "shelter-in-place" order. In addition, because of the lack of sufficient testing, it is difficult to know who is an asymptomatic carrier of the virus who is passing it on to other members of the community.

34.     The high level of uncertainty surrounding the virus and the percentage of people of color in the state of Florida highlights the importance of preparing for elections before the virus has spread further and to allow for the full implementation of free, fair, nondiscriminatory measures that will ensure the right to vote for all eligible Floridians.

**B.    Florida's Failure to Take Adequate Precautions During the Presidential Preference Primary in Response to the COVID-19 Crisis**

35.     On March 1, 2020, Defendant DeSantis declared a public health emergency in response to the COVID-19 crisis. Eight days later—just a week before

Florida's Presidential Preference Primary ("PPP") on March 17, 2020, Defendant DeSantis declared a statewide state of emergency.

36.   On Friday, March 13, 2020, President Trump declared a national emergency to begin mobilizing the extraordinary measures necessary to address the rapidly expanding public health crisis. On Sunday, March 15, 2020, the Centers for Disease Control and Prevention ("CDC") issued guidance advising against gatherings of 50 people or more for the next eight weeks and multiple states began ordering the closure of restaurants and other establishments.

37.   On Monday, March 16, 2020—the day before the PPP—the White House issued new guidance for the public to avoid all social groupings of 10 or more.

38.   Notwithstanding the Governor's emergency declarations and the public health advice from the federal government, Defendants made no accommodations for the PPP to ensure Floridians could vote safely, without the need to gather in groups at polling places.

39.   On March 9, 2020, after the deadline for requesting a mail ballot, Defendant Lee issued a press release encouraging Florida voters to vote by mail, but she did not extend the request deadline or make any other accommodations to ensure Florida voters could vote safely, without risk to their health and well-being.

40.   On Friday, March 13, 2020, the same day President Trump began mobilizing the nation to combat the coronavirus, Defendant Lee, released a joint

statement with the chief election officials of Arizona, Illinois, and Ohio, confirming that the scheduled PPP election would proceed on March 17, 2020, as scheduled.

41.    Despite the emergent circumstances, however, no adjustments to election procedures were made to allow voters unable to vote at their assigned polling places to more easily obtain or return vote-by-mail ballots and be sure they would be counted; no accommodations were made for voters whose age or underlying health conditions made them especially susceptible to the harmful effects of the disease, leaving them with the Hobson's choice of giving up their right to vote or risking exposure through interaction with poll workers and other voters at potentially crowded polling places.

42.    At the same time as Defendants were refusing to take action to make vote-by-mail or other remote voting methods more available, voting in person at polling places became much more difficult. In response to the COVID-19 outbreak, Defendant Supervisors closed, moved or consolidated at least 112 polling places in 22 counties, including many at assisted living facilities whose residents are at more acute risk than the general population. Eight hundred poll workers withdrew from participating in the election in Palm Beach County due to concerns about the pandemic, as did many others throughout the state. Subsequent to the election, at least two poll-workers tested positive for the virus.

43.     Because of the Defendants' failure to make appropriate and necessary accommodations during the PPP, students from across the state, including Plaintiff Williams, and others who were displaced due to school closures, had their right to vote denied. Elderly, ill, and immunocompromised individuals, such as Plaintiff Heller, and individuals who were self-quarantining in accordance with public health guidance, such as Plaintiff Baez—faced with a choice between sitting out the election and compromising their and their families' and communities' health and well-being—did not go out to the polls.

44.     The result was a dramatic reduction in turnout. Turnout among voters registered to either of the major political parties—those permitted to participate in those parties' primaries under Florida's closed primary system—was about 30 percent, as compared to 46 percent in the 2016 Presidential Preference Primary, and 41 percent in 2012, the last primary in which an incumbent president ran largely uncontested in his party's primary.

45.     Despite the low turnout and despite the fact that the vote-by-mail deadline had already passed by the time state and federal officials began imposing restrictions on public gatherings and recommending that vulnerable individuals stay home, the number of ballots cast by mail reached record levels, threatening to overwhelm Supervisors of Elections, many of whom do not have the personal or infrastructure to handle the increased volume.

## C.    COVID-19's Continued Impact in Florida

46.    At the time of the PPP, there were approximately 140 confirmed cases of COVID-19 in Florida and 4 people had died from the virus in the state. Since that time, COVID-19 has spread rapidly in the state, to nearly 26,000 cases and over 750 deaths. As of today, infection rates are continuing to rise.

47.    In response to the virus's spread Governor DeSantis has taken steps to contain the virus, but Defendants still have done nothing to mitigate the impact of the outbreak on Floridians' ability to vote in the upcoming Congressional Primary on August 18, 2020, and the Presidential Election on November 3, 2020.

48.    On April 1, 2020, Governor DeSantis signed Executive Order 20-91 which outlined the state's stay-at-home policy. The Order took effect April 3 and will last until at least April 30th. Executive Order 20-91 requires "[s]enior citizens and individuals with a significant underlying medical condition (such as chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, cancer, diabetes, severe obesity, renal failure and liver disease)" to "stay at home and take all measures to limit the risk of exposure to COVID-19."[8] The order

---

[8] Fla. Exec. Order No. 20-91 (Apr. 1, 2020).

also *requires* local jurisdictions to "ensure that groups of people greater than ten are not permitted to congregate in any public space."[9]

49.    Public health experts report that the nation's current ability to test for the virus is woefully insufficient to allow for easing these restrictions any time soon without risking a second wave of infections. And they say that even if the virus subsides with the warmer summer weather, a recurrence of COVID-19 in the fall is "likely." In such an event, voters in November's Presidential General Election could face the same rapidly changing circumstances that resulted in disruption and disenfranchisement in the Presidential Preference Primary.

50.    But, despite ordering them to *stay* at home, Governor DeSantis has taken no steps to make it possible for vulnerable Floridians to *vote* at home. Nor has he or any of the other Defendants explained how proceeding to hold elections according to business as usual—with voting and voter registration taking place at early voting sites, precinct polling places, and SOE offices—can be done without violating restrictions on gatherings of 10 or more Floridians in public places—restrictions which are necessary, and will remain necessary for the foreseeable future, to maintain public health and prevent further spread of and additional deaths from COVID-19.

---

[9] *Id.*; The federal government has also urged Americans to adhere to and expand community mitigation efforts. Across the United States, about 316 million people in at least 42 states the District of Columbia and Puerto Rico have been ordered not to leave their homes for work, school, or for any non-emergency reason.

**D.      Voter Registration Has Come to a Near Standstill in Florida.**

51.      Florida SOEs are reporting only a trickle of voter registrations coming through mail and online.

52.      Individuals are currently unable to easily obtain paper applications as state offices across Florida that normally offer hard-copy voter registration forms or in-person voter registration services are closed or inaccessible. Public libraries, SOE offices managed by each of the Defendant SOEs, the Department of Highway Safety and Motor Vehicles ("DHSMV"), and other public agencies designated under the National Voter Registration Act ("NVRA"), are all closed or operating at severely reduced capacity in accordance with orders and guidance issued by Defendants, but Defendants have taken no steps to ameliorate the devastating impact these closures have had on the availability of voter registration services.

53.      Many individuals are also unable to obtain a paper application through other means. Though the application is available online, low income voters, including many in communities of color, lack internet access or a printer at home. Many rely on community resources such as the public library for access to the internet and for printing. With the COVID-19 crisis, those resources are not available. Although retail printing services might normally make it possible to print a downloaded voter registration application, most such services, not being designated essential, are currently closed, and even if these service were available, voters with heightened

38

COVID-19 vulnerabilities would have to risk their health in order to avail themselves of them. Without access to the internet or a printer, using the online voter registration form is out of reach for many voters.

54.    Moreover, paper applications are not postage pre-paid, and in an era of email and automatic online bill paying, many people no longer keep stamps at home. And with some post offices closed and with social distancing orders in place, the simple act of buying a stamp to mail a voter registration form has become a challenge for many.

55.    Third-party voter registration efforts, normally a robust source of voter registration services in Florida, have almost entirely ceased. Unable to field their volunteers for door-to-door campaigns or large-scale voter registration events due to the pandemic, organizations such as Plaintiffs NewFM, Organize Florida, and Dream Defenders have been forced to halt their voter registration efforts. Since March 13, 2020, Organize Florida has pulled its approximately 70 canvassers from in-person registration efforts in 9 Florida counties and diverted them to COVID-19 community response. Similarly, starting March 20, 2020, NewFM diverted its 200+ canvassers from in-person registration in 6 Florida counties and moved them to phone calls for wellness checks.

**E.   Florida's Online Voter Registration System Is Unduly Burdensome, Particularly for Communities of Color**

56.     With limited access to paper and downloadable voter registration forms of limited utility for many voters during the COVID-19 pandemic, Florida's online voter registration ("OVR") system is currently one of few accessible means for voters to register. OVR's numerous restrictions and limitations, however, prevent it from being a viable option for many Florida residents and make running third-party voter registration drives much more labor intensive and less effective.

57.     To complete a voter registration through the OVR system, the would-be voter must have a driver's license or identification card issued by DHSMV. The driver's license or identification card number is used both to verify the voter's identity and to obtain the voter's signature. Those that do not have a driver's license or identification card, including many of those served by Zebra Coalition, cannot complete registration process through the OVR system. Instead, the system will produce an electronic voter registration form, which the voter must print, sign, and mail to the county SOE or Secretary of State. Because homeless and housing insecure voters and voters of color are less likely to have identification issued by the DHSMV, they are more likely to encounter this obstacle with online registration.

58.     For the reasons described above, many voters, especially those who lack stable housing and those in low income communities, are simply unable to print and mail a voter registration application from the OVR system.

40

59.    Even when a voter has a valid DHSMV credential, the OVR system makes it difficult or impossible for voters to detect and correct errors in their applications. Voters who register using a paper form are notified if their application is incomplete or if errors are found, and they are provided an opportunity to make corrections. When the OVR system identifies an error, the voter is not notified. Instead, the OVR system switches to producing the same printable, mailable registration application it produces for those who lack the required identification. For example, if a voter mistypes her birthdate, the OVR system will refuse to complete the application online but will not notify the voter of the reason. If the voter is able to print and mail or hand-deliver the application—and for the reasons explained above, many cannot—the error will eventually be identified when one of the Defendant SOEs process the form, and only then will the voter possibly have an opportunity to correct it.

60.    In addition, the OVR system regularly experiences technical breakdowns which cause it to stop functioning and go offline for several hours and as much as an entire day. As recently as March 30, 2020, the OVR system reportedly experienced "intermittent issues" that prevented many Floridians from registering, and in 2018, the system crashed under the weight of increased voter registration activity just before the October registration deadline for the 2018 mid-term election. During the coronavirus pandemic, unlike 2018, when OVR goes offline, potential

voters are left with no means of registering to vote at all, and voters frustrated in their attempts to register through the system often do not return for another try.

61.    These limitations on OVR pose significant obstacles for the voter registration efforts of Plaintiffs NewFM, Organize Florida, Zebra Coalition, and Dream Defenders.  When these organizations are able to resume their registration efforts, they will be limited to simply assisting with online registration.

62.    Organize Florida plans to direct individuals to its website, which will connect to the state's OVR system. But because many voters will be unable to complete the registration process online, Organize Florida will utilize a new "chase" system to ensure that people are actually successful in completing their registration. The "chase" program will involve organizers checking the voter registration system to see if the individuals they register make it onto the rolls, calling the individuals who do not register successfully, asking a series of questions to figure out what was wrong with the person's registration application, and then helping the person correct their application and submit it again. Moreover, the larger number of voters Organize Florida and other organizations will be directing to OVR will increase demands on the system, and may lead to more frequent breakdowns, further hindering the organization's voter registration efforts.

63.    Adding this process to Organize Florida's work will create additional demands on its time and resources. The chase process will also result in the

organization processing significantly fewer voter registration applications than in previous years. With normal canvassing, Organize Florida processes approximately 2 to 2.5 applications every hour and over 3,000 applications on average each month. Without the ability to conduct in-person registration and with the need to follow up with every voter to ensure they become registered because of the limitations of OVR, Organize Florida will be able to reach far fewer voters this year.

64.     Similarly, NewFM normally processes 3,000-5,000 voter registration forms per month. Significantly, fewer people will be able to register through the online system because they lack a Florida driver's license, so NewFM will likewise implement a "chase" program to ensure that people unable to complete their registrations through OVR actually make it onto the voter rolls. NewFM plans to dedicate over a quarter of its canvassers to conducting the "chase" program as a means of ensuring OVR works for its members, diverting canvassers who would normally be out registering additional voters in the communities NewFM serves.

**F.     Florida's Limits on Voting by Mail Unduly Burden the Right to Vote.**

65.     At a time when many voters are confined to their homes or to shelters due to stay-at-home orders and vulnerability to severe health consequences from COVID-19, stringent limitations and restrictions on voting by mail—and Defendant's failure to alleviate them—are unwarranted and will deprive many

Floridians, including individual Plaintiffs and members of organizational Plaintiffs, of their fundamental right to vote.

66.     Moreover, even when the rules don't prevent them from voting by mail, voters of color and young voters face disproportionate rates of rejection of their VBM ballots in Florida. A recent study of mail ballot rejection rates in Florida during the 2018 General Election found that African American and Latinx voters were more than twice as likely as White voters to have their ballots rejected. Voters in the 18-21 age bracket were nearly 5 times as likely to have their ballots rejected as voters in the 45-64 age bracket. Military and overseas voters also faced higher than average rejection rates. With more voters dependent on voting by mail as a means of reducing the risks of contracting COVID-19, Defendants' failure to make changes to mail ballot procedures to address these disparities will result in widespread disenfranchisement among voters who are already under-represented in the electorate.

67.     A Florida voter can request a vote-by-mail ("VBM") ballot in person at a Defendant SOEs' office, by telephone or mail, or by applying online through a Defendant SOEs' website. A voter may also designate certain close family members or a legal guardian to request a VBM ballot on the voter's behalf.

68.     To have a ballot sent to an address other than the address where the voter is registered, the request must be in writing and must be signed by the voter.

44

Telephonic or online requests and requests signed only by a family member are not permitted.

69.     Voters displaced from their homes due to the coronavirus pandemic, such as Plaintiff Williams and many members of organizational Plaintiffs, cannot receive a ballot at the address where they are registered. To request a ballot, such voters must either travel to a Defendant SOEs' office to apply for a VBM ballot in person, in violation of stay-at-home orders, or must submit their VBM ballot requests by mail, which necessitates that they have a printer to print the application and that they pay postage. Plaintiff Williams and many other Floridians, including college and university students whose campuses have shut down, have been forced to leave the state and are therefore unable to request a VBM ballot in person, leaving mail as their only option.

70.     Florida makes an exception to the signature requirement for uniformed and overseas voters, who may receive a mail ballot at an alternate address without a signed, written request. Most of those who have been displaced by the COVID-19 crisis do not qualify for this exception.

71.     Vote by mail ballots are generally delivered by non-forwardable, return-if-undeliverable mail to the address on file with a Defendant SOE or to the address in the signed VBM request. Voters may also request to pick up their VBM ballots in person at the SOE's office, which they can do starting nine days before the election.

45

Uniformed service-members and overseas voters have additional options for delivery of their VBM ballots not available to other VBM voters: They may request that their VBM ballot be delivered by email or fax.

72.     To be timely, VBM ballot requests must be received by a Defendant SOE no later than 10 days before the election. Florida offers a limited ability for voters to request a mail ballot after the deadline in emergency circumstances, but in the context of the COVID-19 crisis, it is insufficient to prevent the disenfranchisement of Florida voters, especially without adjustments to many of Florida's other restrictions on voting by mail. If emergency circumstances arise after the deadline that will prevent the voter from voting at her assigned polling place, Florida allows an application for a vote by mail ballot to be made in person at a Defendant SOE's office, but only on election day. To receive a VBM ballot, the voter must complete a VBM ballot request form and, separately, an affidavit explaining the emergency circumstances preventing the voter from voting at the polls. In some counties, including Miami-Dade County, Defendant SOEs require voters to provide additional documentation of the emergency, such as a doctor's note, to obtain an emergency VBM ballot.

73.     During the PPP, voters with underlying health conditions or whose age made them particularly vulnerable to COVID-19 were unable to avail themselves of an exception that required an in-person visit to a Defendant SOEs' office. The very

emergency that prevented them from voting at their assigned polling place also prevented them from going to a Defendant SOEs' office to obtain and then return a mail ballot. Moreover, requiring each voter to execute an affidavit documenting an emergency that was declared by public health officials and affects everyone in the state will lead to longer times for completing the VBM request process—at a time when people are being advised to avoid all but necessary trips away from their homes—and presents an unnecessary burden on vulnerable voters. Additional requirements, such as a doctor's note, are even more unnecessary and, at a time when healthcare providers are already overburdened and healthy people are being asked to refrain from non-essential procedures, particularly ill-advised.

74.     Voters can designate another person to obtain their emergency VBM ballot on election day. In that case, the voter must complete and sign a designation form appointing the designee, as well as the emergency ballot affidavit. The designee must also complete and sign an affidavit affirming that they are authorized to pick up the VBM ballot for a specified voter.

75.     Designees are limited to obtaining ballots for up to two non-family-members. Some counties impose even tighter restrictions. For example, in Miami-Dade County, Defendant Christina White permits a designee to obtain ballots for only two other voters, even if they are family members, and may only obtain one ballot for a non-family member. Not all voters have family members or others nearby who

can retrieve their ballot for them, and at this time of pandemic, many are unwilling to put others at risk.  In addition, as a result of this rule, institutions such as churches, as well as organizational Plaintiffs, which in normal circumstances provide assistance to voters to help them get to the polls and vote, are unable to effectively get out the vote among their members and constituents. Moreover, limiting the number of ballots any one person can pick up means more people will be going to Defendant SOEs' offices to obtain ballots for vulnerable voters, in violation of public health recommendations.

76.    During a situation where circumstances are changing as rapidly as they have during the COVID-19 pandemic, limiting emergency ballot requests to election day, limiting the number of ballots third parties can pick up for vulnerable voters, and mandating unnecessary and duplicative documentation requirements, are unreasonable and unjustified burdens on the right to vote, and will present a nearly insurmountable barrier to many voters, as it did for Plaintiffs and their members during the Presidential Preference Primary. Given the likelihood of a resurgence of COVID-19 in the fall, according to public health officials, Florida's stringent emergency VMB request procedure will very likely again lead to the disenfranchisement of thousands of Floridians.

77.    To be counted, a VBM ballot must be received at a Defendant SOEs' office by 7 p.m. on Election Day. This means voters wishing to return their ballots

by mail must calculate how long it will take the Postal Service to deliver the ballot and mail early enough that it will be delivered by election day. Except for envelopes designated for military and overseas voters, mail ballot return envelopes are, in most Florida counties, not postage pre-paid, necessitating that the voter obtain postage. In some cases, mail ballot envelopes need additional postage beyond standard first-class mail postage. In at least one county, the amount of postage required depends on whether the voter has accurately followed the instructions on how to fold the return envelope.

78.    Voters may also return their ballots in person at a Defendant SOEs' office or drop off the VBM ballot at a designated secure drop box for early voting sites in the elector's county. Drop boxes are generally located only at early voting sites during the early voting period and at a Defendant SOEs' office. On election day, the only drop box is typically located at a Defendant SOEs' office.

79.    Military and overseas citizens have options for returning their ballots that are not available to other voters. In addition to the return methods available to all voters, these voters can return their VBM ballots by mail or fax to the county Supervisor of Elections or to a fax number provided by the Federal Voting Assistance Program of the Department of Defense. Florida also grants military and overseas voters additional time for the return of their ballots: VBM ballots cast by these voters

are counted as long as they are postmarked or dated by Election Day and received within 10 days after the election.

80.     The state's process for curing signature-match issues will disenfranchise voters. To be counted, the VBM ballot envelope must be signed by the voter and the signature must match the voter's signature in the registration books. If the signature is missing or if a Defendant SOE or the county canvassing board determines that a voter's signature does not match the signature in the registration books, the a Defendant SOEs are required to notify the voter of the signature deficiency, but in many instances, they fail to do so. Canvassing board members and SOE staff responsible for verifying signatures are not required to undergo any training in handwriting analysis or signature verification.

81.     The voter is given the opportunity to "cure" the deficiency by completing and submitting to a Defendant SOE a "cure affidavit" and any of several specified forms of identification. If the voter's signature on the cure affidavit matches the signature on the absentee ballot but not the signature on the voter roll, the ballot will still be rejected unless the voter has provided one of a narrower set of identification documents that bear the voter's photograph. Defendant SOEs do not explain this more stringent identification requirement in the statutorily prescribed cure instructions, however. In addition, the cure notice is not required to include the

cure instructions or affidavit. Rather, it only refers the voter to the instructions on the Defendant SOEs' website.

82.   The cure affidavit may be submitted in-person or by mail, fax or email, and must be received by a Defendant SOE by 5 p.m. on the 2nd day after the election. The cure affidavit is not postage prepaid. To avoid having to deliver the affidavit in person, however, the voter must have internet access at home and a printer to print the affidavit, a scanner, copier, or smart phone to make a copy of the required identification document, and a postage stamp. Moreover, as a practical matter, unless the voter is notified of the problem before election day, submitting the affidavit by mail risks that it will not arrive in time. To avoid that risk, the voter would also need access to email or a fax machine.

83.   Not surprisingly, Florida's vote by mail procedures disproportionately exclude African American and Latinx voters and young voters, among other groups. The very short "cure" period—spanning the two weekdays following an election— and the requirement that the cure affidavit be delivered during business hours poses an obstacle to many working people. Studies show that young voters are more likely to have variations in their signatures, making them more likely to have their ballots rejected.

84.   Throughout Florida, many homes in rural areas do not have addresses or have "non-traditional addresses" that do not use a street name. The postal service

does not deliver to these addresses, so voters in these areas cannot receive ballots at their homes. Likewise, homeless and housing unstable voters, including many of those served by Zebra Coalition, cannot receive mail where they live.

85.    Voters who lack home mail delivery may request that their VBM ballot be sent to a P.O. Box or homeless shelter rather than their place of residence, ruling out telephonic and online VBM requests because of Florida's signature requirement. In addition, rural post offices can be remarkably far and run limited hours. P.O. Boxes cost money and require valid identification to open an account. Sometimes there are not enough boxes to service a community, so friends and families share them, increasing the likelihood of lost ballots and missed rejection notifications, problems also faced by those who receive mail at group quarters such as shelters. Moreover, rural mail is often delayed due to complicated mail routing, increasing the likelihood of missed deadlines.

86.    Many disabled voters, such as Plaintiffs Young, are entirely excluded from using vote by mail unless they are willing to compromise the secrecy of their ballots—a choice other voters do not have to make.

**G.    Voters with Disabilities Face Unnecessary Obstacles to Exercising Their Right to Vote on an Equal Footing with Other Voters During the COVID19 crisis.**

87.    About one in six voting-age Americans live with a disability, and voters who are blind, low vision, or have another print disability or live with physical,

intellectual or developmental disabilities require in-person accommodations at polling places or other voting sites to vote privately and independently. For example, voters who are blind, low vision, or have another print disability need access to accessible voting equipment, including audio ballots or touch screens with enlarged text. Voters with manual impairments making it difficult to hand-mark a paper ballot also require assistive technologies to vote independently and privately. In Florida, however, electronic assistance mechanisms, such as Ballot Marking Devices, are exclusively available at in-person voting locations.

88.    During the COVID-19 pandemic voters with disabilities face an unreasonable risk of contracting COVID-19 at the polls or on their way to polling locations. The accessible machines depend on touch screens or other manual input devices and, in some cases, headphones. This equipment and seating to use it may carry the COVID-19 virus from previous users and poll workers. Visual markers on the ground instructing voters to line up six feet apart from each other and poll workers are not accessible to blind and limited vision voters. Disabled voters who cannot drive face reduced service from paratransit and commercial ride-share vehicles the need to share a vehicle with drivers and other passengers, potentially exposing voters to the COVID-19 virus.

89.    Voters with disabilities who are unable to vote in a precinct polling location or early voting site have few alternative voting options and some are

completely deprived of any alternative voting methods. Florida does not offer curbside voting to voters whose disabilities prevent them from going into an in-person voting location. And many voters with disabilities are unable to avail themselves of the option of voting by mail.

90.     Although Florida law specifically requires the Defendant Secretary of State and Defendant SOEs to "develop and implement procedures and technologies ... for providing vote-by-mail ballots, upon request, in alternative formats that will allow all voters to cast a secret, independent, and verifiable vote-by-mail ballot without the assistance of another person," on information and belief, no Florida county currently provides mail ballots in such alternative formats. Overseas and uniformed services voters have electronic ballot delivery options, but those options are not accessible to voters with visual impairments and in any event are not available to voters who want to vote from home in Florida. The result is that voters who cannot use a standard paper ballot without assistance, such as low vision voters, cannot vote by mail without compromising their independence and the secrecy of their ballots.

91.     Voters with disabilities are also more likely to have their signatures change over time and to have their ballots rejected based on a signature mismatch. For example, Plaintiff Romero, who suffers from MS and a stroke, can no longer sign his name at all.

**H.     Language-Minority Voters Should Not be Forced to Compromise their Health in Order to Make an Informed Vote**

92.     According to the U.S. Department of Justice, Civil Rights Division, approximately 2,107,585 Floridians are limited English proficient.

93.     After the 2010 census, the Director of the Census designated the entire state of Florida as subject to the requirements of Section 203 of the Voting Rights Act for Spanish.  The Census coverage determination is final and non-reviewable therefore Florida is mandated to provide statewide issued/produced voter registration-voting materials in Spanish. Because Florida is subject to the requirements of Section 203, "any statewide registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process" that Defendants provide in English must also be furnished in Spanish.

94.     Although the Division of Elections' website provides a Google translate option to provide the information contained on the web pages in Spanish-language, the very first bullet point, under instructions directing a voter on how to request a vote-by-mail ballot, instructs the user to their respective Supervisor of Elections website.  Clicking on that link leads the user to a Florida Department of State, Division of Elections administered landing page which contains English-only information with no translation or Spanish-language version option available.

95.     The voter must then click on their respective Supervisor of Elections website on this English-only page which navigates the user to a SOE administered

webpage which may only be available in English.  Although the statewide issued forms to request a VBM ballot, designee form and how to cure a signature mismatch are translated to Spanish and are available on the Division of Elections website, the Spanish-language version of the forms may not be accessible to a Spanish-language dominant voter via their respective Supervisor of Elections website, if none of the webpages are translated to Spanish.  Based on information and belief, neither the Union County or Liberty County websites contain any information or link to the Spanish version of the VBM related documents.

96.    Based on information and belief, there are additional Florida counties who provide English only VBM ballots, instructions and related materials and do not offer Spanish-language assistance to help voters who are unable to speak English. This results in unequal treatment of limited English proficient voters and a violation of Section 203.  Compliance with the law on behalf of these voters is made exigent by COVID-19

97.    The same obstacles present to disabled voters, affect Spanish-language dominant voters who are unable to vote in-person because of COVID-19 related health risks.  Although there are currently 13 Florida counties subject to Section 203 coverage which are required to provide Spanish-language materials and assistance at the polling locations, these same services will not be available to voters who are

unable to avail themselves to vote in-person because of COVID-19 related health risks, such as Plaintiffs Romero and Hernandez Morales.

## I.   Supervised Voting at Group Quarters Facilities for Elderly and Other Vulnerable Floridians Is Insufficiently Available.

98.    Under Florida law, SOEs may, on their own initiative or at the request of a facility administrator, offer supervised voting at an assisted living facility or nursing home. Under this system, two poll workers take voting equipment to the facility to allow residents to vote without having to leave the facility.

99.    Voters living in independent living facilities or other group quarters are not eligible for supervised voting under existing rules. In the current health crisis, however, residents of these facilities, many of which are designed for and restricted to elderly residents or others with specific health care needs, face significant health risks if they are required to vote in person at precinct polling places and many face obstacles to voting by mail.

### CLAIMS FOR RELIEF

### COUNT ONE
**Against All Defendants**
**Undue Burden on the Right to Vote in Violation**
**of the Fourteenth Amendment**
**(U.S. Const. Amend. XIV, 42 U.S.C. § 1983)**

100.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

57

101.   This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

102.   Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

103.   Unless Plaintiffs are granted the relief requested, the right to vote of thousands of Floridians, including the Individual Plaintiffs and Organizational Plaintiffs' members and constituents, will be severely burdened (if not eliminated entirely) in the Primary Election on August 18, 2020, and the General Election on November 3, 2020.

104.   Because of the crisis created by COVID-19, many Floridians, including Plaintiffs Heller, Hernandez Morales, Romero, Baez, and Young, are confined to their homes, and because of the uncertainty over when the crisis will have abated sufficiently to lift the stay-at-home restrictions or whether a fall resurgence of

COVID-19 will require re-imposing them, these Floridians face a significant likelihood that they will be unable to vote in-person at their precinct polling locations or unwilling to do so in the face of significant risks to their health.

105.   For vulnerable individuals, including Plaintiffs Romero, Hernandez Morales, Heller, and the at-risk youth served by Zebra Coalition, appearing in person at either the Supervisor of Elections office or the polls would subject them to unreasonable health risks because of their age or underlying health conditions, even if conditions improve enough for healthier Floridians to return to more normal activities.

106.   Others, including thousands of students at Florida colleges and Universities such as Plaintiff Williams, have been sent away from their homes, with no indication when they will be able to return.

107.   Organizational Plaintiffs Dream Defenders, New Florida Majority, Zebra Coalition, and Organize Florida all have members or serve communities who are similarly situated to these individual Plaintiffs.

108.   Without accommodations such as extending early voting days, hours, and locations and curbside voting which would allow them to vote while maintaining necessary social distancing, or expanded availability of supervised voting which would allow them to vote without leaving their residences, in-person voting is likely to be unavailable or unreasonably risky for these voters.

109.   Moreover, they face unnecessary and severe obstacles to their only alternative means of exercising their right to vote this year: voting by mail.

110.   Requiring voters who are displaced or have unreliable access to mail to submit a written and signed request—which can only be done in person or by mail—in order to have their ballot sent to where they are living or where they can receive mail is unduly burdensome and unjustified in circumstances where request forms are more difficult to access, postal service is less available, and unnecessary in-person visits to SOE's offices are ill-advised even for healthy voters let alone voters who face serious health consequences from exposure to COVID-19.

111.   In rapidly changing circumstances such as those seen during the PPP and likely to be seen again through much of the rest of the year, Florida's emergency VBM process is unduly stringent. Requiring voters facing risks from COVID-19 to appear on election day to request a VBM ballot when the emergency circumstances are there for all to see in the days before the election and limiting the number of ballots designees can obtain for other voters will result in larger numbers of voters and designees appearing at SOEs offices on election day, which will violate social distancing guidelines and overwhelm the reduced staffing SOEs are currently working with.

112.   Additionally, limiting the number of voters for whom a non-family member may pick up ballots, will prevent many voters from obtaining ballots at all,

particularly vulnerable voters such as Plaintiffs Heller, Romero, and Hernandez Morales who depend on assistance from others to avoid unnecessary social contact that could threaten their health.

113.   And the failure of the Defendants to offer an accessible means of voting by mail to voters with disabilities likewise constitutes a severe burden on the right to vote, because for many such voters, it means they won't be able to vote at all.

114.   The ballot return deadline, depending as it does on the vicissitudes of postal delivery in a time where all public services are stretched instead of a clear criteria such as a postmark, has resulted and will likely continue to result in the rejection of many mail ballots even though they were promptly returned.

115.   Likewise, the very short cure period, the incomplete cure instructions, limited cure opportunities, and the arbitrary signature verification process when mail is moving slowly—likely too slowly for voters to meet the cure deadline even when they act immediately after being notified of a deficiency—and when voters are unable to deliver cure affidavits in person without risk to their health constitutes an undue burden on the right to vote in the circumstances the country is currently facing, and is unjustified by any legitimate election administration purpose.

116.   Defendants' failure and refusal to make adjustments to these voter registration and in person and vote-by-mail rules will likely deprive thousands of Floridians, including Plaintiffs, their members, and members of their communities of

the opportunity to vote in the remaining 2020 elections, in violation of their rights under the First and Fourteenth Amendments.

117.   Under these circumstances, the State Defendants' and SOEs' enforcement of vote-by-mail request requirements and delivery deadlines, as well as restrictions on emergency voting, and curing signature deficiencies, and its failure to accommodate voters who are particularly vulnerable to COVID-19 by offering curbside voting, additional early voting and supervised voting, accessible vote-by-mail ballots, ballots in voters' preferred languages, and greater access to online voter registration constitute a severe and undue burden on the right to vote.

118.   Defendants have no sufficient justification for their refusal to make changes to Florida's vote-by-mail rules to accommodate the significant challenges voters face as a result of the COVID-19 crisis.

<u>**COUNT TWO**</u>
**Against All Defendants**
**Abridging or Denying the Right to Vote on Account of Race**
**in Violation of § 2 of the Voting Rights Act of 1965**
**(52 U.S.C. § 10301)**

**119.**   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

**120.**   Section 2 of the Voting Rights Act provides in pertinent part:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a).

121.   Florida's current voter registration and vote by mail process has had and—if this Court does not institute the remedies that Plaintiffs request—will continue to have, an adverse and disparate impact on communities of color.  These measures impose a discriminatory burden on African American and Latinx voters and they "have less opportunity than other members of the electorate to participate in the political process."

122.   Regarding vote by mail, communities of color experience higher levels of ballot rejections.  Because of Florida's vague and unreasonably short mail ballot return deadline, and because of the state's restrictive cure requirements as well as the discretion of Defendant SOEs and county canvassing boards to arbitrarily reject voter's signatures, the VBM ballots cast by Black, Hispanic, and other racial and ethnic minorities were more than twice as likely to be rejected as VBM ballots cast by white absentee mail voters in 2018, and with the increased barriers voters face in complying with these strict requirements due to the coronavirus pandemic, these disparities are likely to be aggravated.

123.   Moreover, the lack of voter registration opportunities due to the declared state of emergency prevents Floridians from registering to vote and prevents organizational plaintiffs from registering persons to vote.  The closures of all nonessential entities, including the Department of Motor Vehicles and the Defendant

SOEs' offices make it burdensome and nearly impossible for organizations such as organizational Plaintiffs to conduct third-party voter registration drives, which large numbers of voters of color.

124.   Additionally, the OVR system is unduly burdensome to voters who lack printers or the requisite voter identification to register online—disproportionately Black and Latinx voters.

125.   This burden is connected to historical and social conditions of discrimination.  Under the totality of circumstances, Florida's African American and Latinx voters have had and will continue to experience less of an opportunity to participate in the electoral process due to Defendants failure to adequately address the  impact on the right to vote from the spread of COVID-19, the inability to register to vote, and the disproportionate rejection rate of VBM ballots from communities of color.

126.   These disparities constitute a violation of § 2 of the Voting Rights Act. Unless enjoined by this Court, Defendants will continue to violate Section 2 of the Voting Rights Act, by enforcing standards, practices, or procedures that deny African American and Latinx the opportunity to participate effectively in the political process on an equal basis with other members of the electorate.

**<u>COUNT THREE</u>**
**Against All Defendants**
**Failure to Provide Reasonable Accommodations**

**in Violation of Title II of the Americans with Disabilities Act**
**(42 U.S.C. §§ 12131, *et seq.*)**

127.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

128.   Under Title II of the Americans with Disabilities Act, state and local governments must not impose requirements on participation in public services, programs, or activities, including voting, that screen out individuals with disabilities from fully and equally enjoying those programs and must make reasonable modifications in policies, practices, or procedures, including voting and election procedures, when the modifications are necessary to avoid discrimination on the basis of disability.

129.   Individuals who suffer a significant medical vulnerability that places them at extremely high risk of serious bodily injury or death should they leave the confines of their homes—including Plaintiffs Hernandez Morales and Romero whose health conditions puts them at significant risk of severe illness or death should they contract COVID19—have a disability within the meaning of the ADA.

130.   Plaintiff Young is blind and has a disability within the meaning of the ADA.

131.   Defendants' failure and refusal to extend the vote-by-mail deadlines; expand availability of emergency vote-by mail procedures; expand the methods for requesting, obtaining, and returning vote-by-mail ballots; and adopt safe and

accessible methods of in-person voting constitute a failure to make a reasonable accommodation for those, such as Plaintiffs Heller, Romero, and Hernandez Morales, whose health and age limit their ability to have contact with others in this time of public health emergency created by COVID-19.

132.   Defendants' failure to offer VBM ballots in a form that is accessible to blind or low-vision voters or voters with manual impairments limiting their ability to mark a paper ballot, despite requirements in Florida law mandating that they do so and when the necessary technology is readily available, likewise constitutes a failure to make a reasonable accommodation for voters such as Plaintiffs Young and Romero, who need such accommodations in order to independently and confidentially cast a VBM ballot.

133.   The failure to accommodate these voters constitute a condition on access to the ballot box that has the effect of screening out such individuals from participating in the August 18, 2020, Primary Election and the November 3, 2020, General Election, in violation of Title II of the Americans with Disabilities Act.

**<u>COUNT FOUR</u>**
**Against All Defendants**
**Failure to Provide Reasonable Accommodations**
**in Violation of Section 504 of the Rehabilitation Act**
**(29 U.S.C. § 794)**

134.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

135.   Under Section 504 of the Rehabilitation Act, federally funded programs, including state and local programs related to elections and voting, must not discriminate against individuals with disabilities and must make reasonable accommodations to allow individuals with disabilities to access the federal funded program, activity, or service.

136.   Individuals who suffer a significant medical vulnerability that places them at extremely high risk of serious bodily injury or death should they leave the confines of their homes—including Plaintiffs Hernandez Morales and Romero whose health conditions puts them at significant risk of severe illness or death should they contract COVID19—have a disability within the meaning of the ADA.

137.   Plaintiff Young is blind and has a disability within the meaning of the ADA.

138.   Defendants' failure and refusal to extend the vote-by-mail deadlines; expand availability of emergency vote-by mail procedures; expand the methods for requesting, obtaining, and returning vote-by-mail ballots; and adopt safe and accessible methods of in-person voting constitute a failure to make a reasonable accommodation for those, such as Plaintiffs Heller, Romero, and Hernandez Morales, whose health and age limit their ability to have contact with others in this time of public health emergency created by COVID-19.

139.   Defendants' failure to offer VBM ballots in a form that is accessible to blind or low-vision voters or voters with manual impairments limiting their ability to mark a paper ballot, despite requirements in Florida law mandating that they do so and when the necessary technology is readily available, likewise constitutes a failure to make a reasonable accommodation for voters such as Plaintiffs Young and Romero, who need such accommodations in order to independently and confidentially cast a VBM ballot.

140.   The failure to accommodate these voters constitute a condition on access to the ballot box that has the effect of screening out such individuals from participating in the August 18, 2020, Primary Election and the November 3, 2020, General Election, in violation of Section 504 of the Rehabilitation Act.

## COUNT FIVE
**Against the All Defendants**
**Failure to Provide Spanish-language Voting Materials and Assistance**
**in Violation of Section 203 of the Voting Rights Act of 1965**
**(52 U.S.C. § 10503)**

141.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

142.   The state of Florida became a covered jurisdiction under Section 203 of the Voting Rights Act on October 13, 2011 for Hispanic minority group, Spanish language.

143.   Section 203 requires covered states or political subdivisions to provide any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots ... in the language of the applicable minority group as well as in the English language.  52 U.S.C. § 10503(c).  The Defendants' failure to provide VBM ballots, related instructions and documents to request, mark, return, and cure VBM ballots and other electoral materials in Spanish-language as provided to English-language voters contravenes the law which requires Spanish-language dominant voters receive materials and assistance needed to make an informed vote.

144.   Plaintiffs Romero and Hernandez Morales are Spanish-language dominant voters requiring language assistance and materials in order to cast an informed vote.

145.   Defendants' failure to offer Spanish-language VBM ballots statewide to Spanish-dominant voters despite requirements mandating that they do so constitutes a failure to provide materials necessary for voters such as Plaintiffs Romero and Hernandez Morales, who need Spanish-language ballots, related materials and assistance in order to independently and confidentially cast a VBM ballot.

**COUNT SIX**
**Against the County Defendants**
**Denial of Procedural Due Process Clause**
**(U.S. Const. Amend. XIV, 42 U.S.C. § 1983)**

146.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

147.   The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. The right to vote is the most fundamental liberty guaranteed by the Constitution, and eligible citizens cannot be deprived of that right without due process. At a minimum, due process requires that, before depriving a citizen of the right to vote, Florida must provide adequate notice that the right is in jeopardy and a meaningful opportunity for the individual to be heard.

148.   Florida's creation of an absentee voting scheme requires the state to administer that scheme in accordance with the Constitution, including the protections of procedural due process. Having extended the right to vote by mail to its citizens, the state may not impose procedures and conditions on the exercise of that right that can and do result in deprivation of the right to vote without due process.

149.   Florida's vote-by-mail scheme deprives many voters of their right to vote with neither adequate notice nor a meaningful opportunity to be heard. Under Florida's statutory scheme for counting VBM ballots, the state's sixty-seven SOEs and County Canvassing Boards are required to count only VBM ballots *received* by

70

mid-day on Election Day. If the SOE or Canvassing Board finds any potential inaccuracy, mismatch in signature, or missing necessary information, the ballot will be rejected unless the voter cures the defect in the very short cure period of only two weekdays following Election Day.

150.   The Election Day deadline for receipt (as opposed to post-mark or signature date deadline) of voted VBM ballots already makes it difficult or impossible for voters to know when they must mail their ballot to get it in on-time to be counted. This situation is even more acute because mail is moving at an unprecedentedly slow rate due to COVID-19. And although returning a ballot in person on or before Election Day (even assuming the SOEs' offices are open and sufficiently staffed) will avoid this uncertainty, the COVID-19 crisis means high risk voters will be forced to choose between risking their health or risking that their ballot is not received on time.

151.   Likewise, the cure process's lack of adequate notice and the limited, arbitrary, inaccessible, and often non-existent opportunity to be heard constitute a violation of Due Process in the circumstances the country is currently facing. Coupled with Florida's haphazard procedure for notifying voters of defects in their VBM ballots and the often extremely short period for curing the defect after notice is attempted, the impact of COVID-19 on mail delivery times and on the ability of voters to return ballots in person means voters will not be made aware of ballot

deficiencies within the time period allowed under Florida law to correct those deficiencies and have their ballot be counted—or at all.

152.   Furthermore, the very short cure period, the incomplete cure instructions, limited cure opportunities, the arbitrary signature verification process, and voters' inability  to deliver cure affidavits in person without risk to their health, will fail to provide voters with the requisite opportunity to be heard prior to being permanently deprived of their right to vote in the upcoming elections.

153.   The signature and ballot verification process is entirely arbitrary. The members of the Defendant Canvassing Boards and staff of the Defendant SOEs who are responsible for verifying signatures are not required to undergo any training in handwriting analysis or signature verification, creating a likelihood that the signature match process will erroneously flag lawful ballots and threaten the votes of eligible voters who are subjected the cure process.

154.   Once a ballot is flagged as deficient in some way through this arbitrary process, voters must be notified. Since not every voter has an email address or telephone number on file with the SOE, the voter is notified by mail which means that voters may receive notice of the deficiency only after the cure period has expired. Those voters who are notified of a deficiency in their vote-by-mail ballots by telephone or email must have access to the internet to seek out and download the cure affidavit and instructions. They must also have access to a printer to print the cure

affidavit. If they are able to do those things, they then must complete, sign and return the affidavit. Like mail ballots, cure affidavits are subject to a receipt deadline rather than a postmark deadline. If the voter's cure affidavit is not received by 5pm on the second day after the election, the voter's ballot is rejected.

155.   Voters who have access to a scanner or fax machine may be able to return the affidavit by email or fax, but many voters do not have such resources available, particularly when they are sheltering at home during the COVID-19 pandemic. Such voters—who may have received notice on the same day as the cure deadline—must return the affidavit by mail, requiring them to pay postage and risk that the affidavit is received after the deadline, or must risk their health or the health of their family during the COVID-19 crisis to return the affidavit in person.

156.   When a cure affidavit is submitted, it is subject to an additional verification process. If the Defendant Canvassing Board or SOE determines that the affidavit is insufficient—again through an arbitrary signature matching process carried out in many cases by untrained personnel—the voter is given no further opportunity to document their identity and have their ballots counted. Moreover, the cure instructions fail to notify voters that only some of the forms of identification that may be provided with the cure affidavit will be accepted and allow the ballot to be counted if the County Defendants conclude that the signature on the cure affidavit again does not match.

157.   Given the arbitrary and unpredictable nature of the signature match process and the corresponding likelihood that individuals who legitimately cast their vote-by-mail ballots will need to cure but will be unable to do so within the time-frame allotted under Florida law, the County Defendants are likely to erroneously deprive legitimate and lawful voters of an opportunity to cast a completed ballot and have it counted without providing them with the requisite opportunity to be heard.

158.   The County Defendants' enforcement of Florida's vote-by-mail deadline, signature match verification process, and cure process are fundamentally unfair and violate the Due Process Clause of the Constitution under the circumstances caused by the COVID-19 pandemic They leave the electorate with insufficient information to know whether their ballot was counted and how to cure mistakes, and insufficient opportunities to cure those mistakes once identified. The scheme operates to the particular disadvantage of voters of color, disabled voters, LEP voters, and low-income voters, who are less likely to have the equipment necessary to return their cure affidavits to the SOE in a safe and timely manner.

159.   The VBM ballots receipt deadline deprives Florida voters of their right to vote without due process of law because it provides insufficient notice of when voters must deliver their ballots to the postal service to have them counted. This violation is aggravated in a time when postal delivery times are even more unpredictable.

160.   The signature verification process deprives voters of their right to vote without due process because it subjects voters to a cure process based on an arbitrary and error-prone procedure often carried out by staff of the County Defendants who are not qualified to perform the required signature matching.

161.   The two-day deadline for voters to cure deficiencies with their VBM ballots deprives them of the right to vote without due process because it prevents many voters from receiving notice prior to having their ballots rejected, and because it prevents many voters from being able to return their cure affidavits prior to the deadline, depriving them of any opportunity to be heard before having their ballot rejected.

162.   Finally, the cure process deprives voters of their right to vote without due process because the cure instructions fail to notify voters of what forms of identification will suffice to establish their identity if the affidavit signature does not match voter registration records, and because there is no further notice or opportunity to verify the voter's identity if the cure affidavit is rejected.

163.   Additional or substitute procedural safeguards to ensure that Florida's vote by mail system does not erroneously deprive voters, particularly low-income, voters of color, disabled voters and LEP voters, of an opportunity to cast a completed ballot are available and would impose no burden on the County Defendants. The state's sixty-seven SOEs and County Canvassing Boards are not required to finalize

election results for twelve days after the general election—a deadline that can be extended by Defendant Elections Canvassing Commission in emergency circumstances, see Fla. Stat. Ann. § 102.112. Counting ballots postmarked or dated by the postmark and received within 10 days would not interfere with this deadline. Indeed, such a deadline already applies to the ballots of UOCAVA voters in Florida. Likewise, extending the cure deadline would not interfere with the relevant canvassing deadline, particularly if that deadline were extended to address the emergency circumstances created by the COVID-19 pandemic and the significantly higher volume of mail ballots it is expected to cause. Requiring County Defendants to use more robust VBM ballot verification procedures would not substantially slow the counting of ballots and can readily be achieved with additional training and the use of objective criteria, and updating the cure instructions to completely and accurately notify voters of the requirements for a cure and the differential treatment of the different forms of acceptable identification in various circumstances would be trivial. Finally, notifying voters whose cure affidavits have been rejected, particularly those that could be cured with an alternate form of identification, that their ballots will not be counted is feasible and not burdensome.

164.   The VBM scheme operated by the County Defendants operates to deprive or threatens to deprive many Floridians, including the individual Plaintiffs and the members and communities served by organizational Plaintiffs, of their

Constitutionally protected right to vote without due process of law, in violation of the Due Process Clause of the 14th Amendment.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiffs respectfully request this Court enter judgment:

a.   Preliminarily and permanently enjoining Defendants to undertake emergency actions with respect to any election in the state affected by the COVID-19 pandemic;

b.   Ordering Defendants to implement measures to ensure eligible Floridians are able to register to vote, including:

   i.   conducting outreach to unregistered and inactive voters offering the opportunity to register to vote or update their voter registrations prior to the voter registration deadlines for the August 18, 2020, and November 3, 2020, elections;

   ii.   ensuring Florida's online voter registration system has sufficient capacity to accommodate the increased number of voters who will need to register to vote or update their voter registrations through the system;

   iii.   allowing voters who lack a Florida driver's license or identification card to register to vote online using solely the last four digits of their social security number;

  iv. notifying voters of errors with their online voter registration applications without requiring them to print and mail a paper voter registration application;

c. Ordering Defendants to modify vote-by-mail procedures to ensure they are available and accessible to all registered voters, including by:

  i. Permitting voters to have their ballot sent to an alternate address to the one on file with the SOE without requiring the request to be signed and in writing, or, alternatively, sending a postage pre-paid vote-by-mail request form to all currently registered voters;

  ii. ensuring that every voter is mailed a ballot in accordance with their language preferences and providing language assistance, as required by the Voting Rights Act;

  iii. ensuring vote-by-mail ballots are available in formats that are accessible to voters with disabilities without requiring assistance from another person;

  iv. accepting returned vote-by-mail ballots and counting them as long as they are postmarked or dated by Election Day and received within ten days of Election Day, and

  v. expanding the number and locations of drop-boxes, and accept ballots returned to a drop-box no later than Election Day;

      vi.  allowing voters to utilize the emergency vote by mail ballot procedures in the nine days before election day and suspending the documentation requirements for establishing an emergency, including county-level requirements;

     vii.  suspending limits on the number of ballots that may be obtained and the manner of their return by non-family members authorized by voters to obtain and return their mail ballots;

    viii.  extending the vote-by-mail "cure" period for ballots with missing or mismatched signatures, and ensuring signature matching and cure procedures and instructions are clear, objective, reliable, accessible, and non-discriminatory;

d.    Ordering Defendants to ensure in person voting is safe and accessible, including by

      i.  expanding the days, hours, and locations of early voting;

     ii.  establishing curb-side voting at each polling location;

    iii.  expanding availability of "supervised voting;"

    iv.  ensuring CDC guidelines for reducing the risk of COVID-19 exposure are followed;

e.      Ordering Defendants to ensure that all voter registration forms, vote-by-mail request forms, vote-by-mail return envelopes, and cure affidavits can be sent postage pre-paid;

f.      Ordering Defendants to provide all the above materials and information in Spanish-language;

g.      Ordering Defendants to publicize, in English, Spanish, and other languages spoken by a substantial number of Florida voters, the changes to voting and vote-by-mail procedures;

h.      Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. 1983 and other applicable laws; and

i.      Granting such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: April 20, 2020                          _s/ Stuart C. Naifeh_____

JUDITH A. BROWNE DIANIS**          JOHN ULIN**
GILDA DANIELS*                     Arnold and Porter Kaye Scholer LLP
SHARION SCOTT*                     777 South Figueroa Street
JESS UNGER**                       44th Floor
JENNIFER LAI-PETERSON**            Los Angeles, CA 90017
Advancement Project National Office (213) 243-4000
1220 L Street N.W., Suite 850      John.Ulin@arnoldporter.com
Washington, D.C. 20005
(202) 728-9557                     JEFFREY A. MILLER**
jbrowne@advancementproject.org     Arnold and Porter Kaye Scholer LLP
gdaniels@advancementproject.org    3000 El Camino Road
junger@advancementproject.org      Five Palo Alto Square, Suite 500
sscott@advancementproject.org      Palo Alto, CA 94306-3807
jlaipeterson@advancementproject.org (650) 319-4500

CHIRAAG BAINS*
Dēmos
740 6th Street NW, 2nd Floor
Washington, DC 20001
(202) 864-2746
cbains@demos.org

STUART NAIFEH*
KATHRYN C. SADASIVAN*
MIRANDO GALINDO*
EMERSON GORDON-MARVIN**
Dēmos
80 Broad St, 4th Floor
New York, NY 10004
(212) 485-6055
snaifeh@demos.org
ksadasivan@demos.org
mgalindo@demos.org
egordonmarvin@demos.org

KIRA ROMERO-CRAFT
(FL SBN 49927)
LatinoJustice PRLDEF
523 West Colonial Drive
Orlando, Florida 32804
(321) 418-6354
kromero@latinojustice.org

FRANCISCA FAJANA*
JACKSON CHIN**
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 739-7572
ffajana@latinojustice.org
jchin@latinojustice.org

Jeffrey.Miller@arnoldporter.com

JAVIER ORTEGA**
Arnold and Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Javier.Ortega@arnoldporter.com

JEREMY KARPATKIN**
FLORENCE BRYAN**
WILLIAM OMOROGIEVA**
JUNGHYUM BAEK**
Arnold and Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
(202) 942-5000
Jeremy.Karpatkin@arnoldporter.com
Florence.Bryan@arnoldporter.com
William.Omorogieva@arnoldporter.com
Junghyun.Baek@arnoldporter.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice
**Application for admission pro hac vice forthcoming